Filed 4/28/14  P. v. Vera CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056903 |
| v. | (Super.Ct.No. FWV 900137) |
| DANIEL VERA, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Shahla Sabet, Judge.  Reversed in part and affirmed in part with directions.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

A jury found defendant Daniel Vera guilty as charged of the first degree murder of his fellow gang member Manuel Vega and of active gang participation based on the murder. (Pen. Code, §§ 187, subd. (a) (count 1), 186.22, subd. (a) (count 2).)[1] The jury also found multiple firearm enhancements and a gang enhancement true on the murder conviction. (§§ 186.22, subd. (b), 12022.53, subds. (b), (c), (d).) Defendant was sentenced to 25 years to life for the murder plus 25 years to life for the section 12022.53, subdivision (d) enhancement, and 10- and three-year terms, respectively, were imposed but stayed on the gang enhancement and the active gang participation conviction.

We reject defendant's first two claims: that the court abused its discretion in denying his new trial motion based on ineffective assistance of trial counsel and that insufficient evidence supports the gang enhancement. But the People concede, and we agree, that defendant's other claims have merit. Specifically, defendant's active gang participation conviction must be reversed because there is insufficient evidence he committed the murder with at least one other gang member. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132 [substantive crime of active gang participation requires gang member to willfully advance felonious criminal conduct by another gang member].) The People also concede, and we agree, that the 10-year stayed term on the gang enhancement must be stricken in favor of a 15-year minimum parole eligibility period on defendant's 25-year-to-life sentence for the murder. (§ 186.22, subd. (b)(1)(C), (5).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

We therefore reverse the active gang participation conviction, strike the three-year stayed sentence on that conviction, and correct the sentencing error on the gang enhancement. In all other respects, we affirm the judgment.

## II. BACKGROUND

A. *Prosecution Evidence*

### 1. The Shooting

Shortly before 6:00 p.m. on January 13, 2009, James M. left his apartment in Upland, along with his wife, to meet with his tax advisor. As he walked to his car, James saw Vega, crouching down, with his head down, leaning against a telephone pole and fidgeting with something in his hands. Vega's mother lived in the same apartment complex and James saw Vega at the complex there several times each week. James and Vega were on friendly terms and often spoke about their children, who played together.

James believed Vega was a gang member because he had seen that Vega had "Black Angels" tattooed on his back in big black letters. James knew the Black Angels were part of the South Side Onterio gang, and James had seen Vega speaking to other gang members at the apartment complex. The other gang members also had tattoos of "Onterio or BA" on their necks.

As James walked by, Vega did not acknowledge him, which was unusual. Defendant was standing three to five feet from Vega, and stared at James in an intimidating manner or "mad dogged" James as he walked by. James looked defendant "right back in the eyes" and got a good look at his face. James was "a hundred percent

3

"sure" defendant was the man he saw talking to Vega. When James got into his car to leave, the clock in the car read 5:55 p.m.

James did not know defendant but had seen him at the complex three times before, talking to Vega, and knew defendant had the word "Onterio," spelled with an "e" instead of an "a" tattooed on the back of his neck. Defendant was wearing light blue plaid shorts, a black hooded sweater, blue/black baseball cap with the letter B on it, and the hood from his sweater was pulled over his cap.

When he returned home that evening, James saw police officers and a body on the ground covered by a sheet. James did not know defendant by name, but gave the police a description of the man he had seen with Vega, describing his clothing, height and weight, and as someone he knew had "Onterio" tattooed on the back of his neck.

James's daughter N. was 14 years old at the time of the shooting and 17 years old at the time of trial. N. was at home watching her younger brother after her father, James, and her stepmother left the family apartment. Around 8:00 p.m. that evening, she heard a total of five shots fired. She looked out a window and saw Vega bending over, holding his stomach, and saw defendant "pass by" Vega.

N. then walked outside and saw a man running away. As the man ran, he "glanced back" at N., then kept running. N. did not see the man's face because he had a hood on, but she saw he was wearing blue checkered shorts, a black hoodie, and black shoes. She could not "really say" the man was defendant but "had a big feeling" it was after she saw

4

defendant's photograph at the police station after the shooting.  She had seen defendant around before, talking to Vega, and knew he had two "horns" tattooed on his head.

Vega's mother, Sylvia Salazar, heard a "big boom" from inside her apartment sometime after 5:30 p.m.  She went outside, ran over to Vega, and "some guy" jumped over Vega and ran right by her.  The man was short,[2] Hispanic, and wearing a black hooded sweatshirt and blue plaid shorts.  After the man ran he stopped, pivoted, went down on his knee, and stared at Salazar.  Salazar could not see the man's face but thought he was going to shoot and kill her.  The man then ran outside the gate to the apartment complex, and at that point Salazar saw "another guy" running on the other side of the gate.

2.  The Investigation

Police were dispatched to the scene at 6:09 p.m.  Vega died from a gunshot wound to the front of his head.  The location of the injury and the direction of travel of the bullet were consistent with Vega having been shot while in a crouched position by a perpetrator in front of him.  No gun or bullet casings were found at the scene, and a medium to large caliber bullet fragment was consistent with a revolver and a semiautomatic.

Vega had $90 on his person and small tin foil balls in his left hand that appeared to contain heroin.  According to a 19-year police detective, the money and drugs were inconsistent with a drug-deal-gone-bad scenario because, in those cases, the money and drugs are usually taken.

---

[2]  Defendant is 5 feet 11 inches tall.

At a police station on the night of the shooting, James looked through photographs of persons with "Onterio" tattooed on the back of their necks, but did not recognize anyone as the person he saw talking to Vega. These photographs did not include defendant's photograph.

After receiving a description of the perpetrator and his tattoo, Detective Berdnick, a gang expert in the Ontario Police Department, "immediately knew" the police were looking for defendant. According to Detective Berdnick, defendant was the only person at that time from the Black Angels who had that particular "Onterio" tattoo.

When shown a photograph of the tattoo on the back of defendant's neck on January 14, 2009, the day after the shooting, James identified the tattoo as the one he had seen on the man he saw talking to Vega shortly before 6:00 p.m. on the night of the shooting. A short time later, James saw a photograph of defendant as a police sergeant was looking through his notes and other photographs, and without hesitation said: "That's the guy." Several days later, on January 19, James identified defendant from a six-pack photographic lineup.

The police searched defendant's home and vehicles. In a detached garage where defendant stayed, they found two dark colored hooded sweatshirts, one with a zipper and one was a pullover. A single particle of gunshot residue was also found on the black zip-up hooded sweatshirt. Inside defendant's vehicle, the police found four pairs of plaid shorts, two blue, one gray, and one black. James identified a pair of the blue plaid shorts as the pair defendant was wearing on the night of the murder. A single particle of

6

gunshot residue was found in a batch test of two pairs of the shorts, including the pair James identified.

3. Gang Expert Testimony

Ontario Police Officer Gabriel Gutierrez testified as a gang expert for the prosecution. According to Officer Gutierrez, defendant and Vega were members of the "South Side Onterio" criminal street gang, which controlled almost the entire city of Ontario. At the time of trial the gang had over 500 members or associates and three levels or tiers: the Onterio Varrio Sur (OVS) (the bottom tier); the Onterio Angelitos Negros or Junior Black Angels (the middle tier); and the Black Angels (the top tier).

The gang's symbols, commonly exhibited in tattoos, are BA (Black Angels), OAN (Onterio Angelitos Negros), OVS (Onterio Varrio Sur), SS (South Side), IE (Inland Empire), and the word Onterio with an "e." Seasoned members could have tattoos representing all three tiers, and members are known to wear California Angels hats in black or blue, Orioles hats with an "O," baggy pants, plaid shorts, and socks pulled up. To be promoted to higher tiers, members are required to "put in work," that is, commit crimes for the gang. The primary activities of the gang include murder, extortion, robbery, and graffiti, and predicate offenses committed by South Side Onterio members show a pattern of gang activity and that the South Side Onterio is a criminal street gang.

The "South Side" part of the gang's name does not refer to the south side of the City of Ontario; it means the gang's members are allied with and serve as "foot soldiers" for the Mexican Mafia, a group of 200 or so gang members from Southern California-

7

based Hispanic gangs who control all Southern California-based Hispanic gangs. Among other things, Mexican Mafia members collect money from gang members' narcotics sales and order hits on other gang members. In order to become a Mexican Mafia member, a gang member has to be "voted in" by at least three other gang members from different gangs. Most Mexican Mafia members are in state or federal prison, and each leads a "crew" of gang members in generating money for himself and his family. The Mexican Mafia logo is a black hand, signifying its members can "reach out and touch anybody at any time."

Defendant was a self-admitted member and, in the opinion of Officer Gutierrez, an active participant in the Black Angels tier of the South Side Onterio at the time Vega was murdered. Defendant has a "B" and an "A" tattooed above his eyebrows (which look like horns), "BA" on his forearms, "OVS" on the top of his head, and "Onterio" on the back of his neck. Officer Gutierrez did not know of any other South Side Onterio gang member who had a tattoo the size and boldness of defendant's "Onterio" tattoo. Sometime before the murder, Officer Gutierrez congratulated defendant for becoming a Black Angel, and defendant said "thank you" and did not deny it.

Officer Gutierrez later testified that Vega was "probably the highest ranking Black Angel . . . on the streets at the time" of his death and was "very, very, very well respected" in the gang culture. Defendant's friend, David Navarro, was probably the second-highest ranking Black Angel. A "green light" had apparently been issued on Vega, meaning other South Side Onterio gang members had permission to kill him.

When a green light is issued, it is common practice for the gang to designate someone close to the victim to kill him. A perpetrator who is close to the victim can "lure out the victim" without the victim knowing he's going to be killed.

Defendant was Vega's friend and visited him several times each week at the Upland apartment complex where he was killed. Anyone in the higher echelon of the Black Angels could have given the green light or ordered the hit on Vega, according to Officer Gutierrez. Vega and Navarro were each "backed by" Black Angels who had been promoted into the Mexican Mafia. And a green light or order to kill such a high-ranking Black Angel as Vega "had to have come" from a Mexican Mafia member, the officer testified.

B. *Defense Evidence*

    1. Cell Phone Records

At the time of his arrest, defendant was in possession of a cell phone connected to the number (909) 489-7712. A second number, (909) 489-8850, was on the same Sprint/Nextel account. Defendant's brother, Francisco Vera, was the account subscriber. The shooting occurred three aerial miles, as a bird flies, from the home where Francisco and defendant lived. The (909) 489-7712 number made and received calls on January 9, 2009, at 5:58 p.m. (received), 6:10 p.m. (outbound),[3] 6:11 p.m. (outbound), 6:29 p.m. (received), 6:35 p.m. (received), and 7:30 p.m. (received). The calls "pinged off" a cell tower located less than one-half aerial mile from Francisco and defendant's home. The

---

[3] The 911 call was made at 6:09 p.m.

9

records of the calls are therefore consistent with the person using the (909) 489-7712 number being at that home at the time of the shooting.

The records do not show who was using the (909) 489-7712 number. The maximum distance a phone can be away from a cell tower it is pinging off is two miles. Therefore, the (909) 489-7712 number was not being used at the crime scene, which is more than two miles from the cell tower. The records for the (909) 489-8850 number had been purged by the time of trial.

2. Defendant's Testimony

Defendant claimed he was at home with his brother Francisco when he learned Vega had been killed on the night of the shooting. He had just returned home from the Ontario Mills Mall and he was wearing dress clothes—blue slacks, a button up shirt, and blue dress shoes.

Surveillance photographs taken at the mall showed defendant in his Suburban pulling up to "Entry 10" at 5:12 p.m. on January 13, 2009. Two other men, Miguel Gutierrez and Jeffrey Mendez, were in the vehicle. At 5:14 p.m., the three men are shown walking into Entry 10, with defendant wearing blue dress pants and blue Stacy Adams shoes. At 5:33 p.m., the three men are shown leaving the mall, heading towards the parking lot.

After leaving the mall, defendant claimed he drove to visit friends on Nocta Street, stayed there for 20 or 30 minutes, then went to his mother's house and made soup. His friend, David Navarro, then called from the crime scene and told him Vega had been

10

"smoked," that is, shot. He went to the crime scene and met Navarro. Before leaving his mother's house he changed from his dress clothes into blue jeans, a blue shirt, white shoes, and a blue New York Yankees cap. He visited Vega three or four times a week where Vega's mother lived and had seen James a few times when he was over there.

Defendant admitted being a Black Angels gang member, the gang is a "crime organization," and when he joined the gang he knew he would have to commit crimes and he was willing to do so. The four pairs of plaid shorts found in the Yukon belonged to defendant, and he knew of no other Black Angels who had a tattoo like his on the back of his neck. Defendant was arrested on January 15, 2009, around 30 hours after the shooting.

3. Other Defense Evidence

Defendant's brother Francisco and friends, Jeffrey Mendez and Benjamin Venegas, testified consistently with defendant's version of events. But according to Francisco, when defendant left their mother's house after receiving the phone call reporting Vega's death, defendant was wearing a hooded sweater and some shorts.

It took defense investigator Daniel Mendoza 16 minutes and 46 seconds to drive from Ontario Mills Mall to the crime scene. He left the mall at 5:33 p.m. as defendant did and arrived at the crime scene at 5:50 p.m., which meant that defendant had approximately 17 minutes to change clothes and commit the crime, if he had driven directly to the scene of the shooting from the mall, because the 911 call came in at 6:09 p.m.

11

Francisco agreed that defendant's cell phone number was (909) 489-7712 and he used the (909) 489-8850 number. Francisco told investigator Mendoza he called defendant's cell phone from his cell phone between 5:00 and 6:00 p.m. He got home 5 to 10 minutes after the call, and defendant was making soup. The cell phone records do not show a call from Francisco to defendant between 5:00 and 6:00 p.m., however. Francisco later testified he sent a text message to defendant rather than calling him.

C. *Rebuttal*

On January 15, 2009, a police sergeant interviewed defendant and asked where he was around 6:09 p.m. on January 13, 2009. Defendant said he was at the Ontario Mills Mall; he parked in "Area Neighborhood No. 10" and went to the Oakley store. He told Sergeant Lawrence Latimer to "[c]heck the video." Sergeant Latimer had not told defendant about there being a surveillance video. Defendant also told Sergeant Latimer: "You can even check the lenses on some of the glasses [at the Oakley store]" because his fingerprints were on the lenses.

As a ruse, a detective who participated in the interview told defendant he had watched the surveillance video from the mall and had not seen defendant on it. Defendant then changed his story: he was not at the mall; he was in Ontario; his phone would show he was in Ontario and Navarro called him; and Navarro told him Vega had been shot.

12

III.  DISCUSSION

A. *The New Trial Motion Based on Ineffective Assistance Was Properly Denied*

Defendant claims the trial court abused its discretion in denying his new trial motion based on the ineffective assistance of his trial counsel.  He argues his trial counsel was ineffective and could not have had a strategic reason for failing to object to Officer Gutierrez's expert testimony or factual assumption, in responding to questions, that defendant was the person who shot and killed Vega.  We find no abuse of discretion, and any error in failing to object was harmless because the trial court repeatedly admonished the jurors that it was for them to decide whether defendant was the person who shot and killed Vega.

1.  Relevant Background

At one point during Officer Gutierrez's testimony, the following colloquy occurred:

"[THE PROSECUTOR:]  . . . And the commission of this crime, this murder, does it . . . aid and assist other gang members in the conduct of their putting in work, their criminal activity?

"[OFFICER GUTIERREZ:]  Yes.

"[THE PROSECUTOR:]  How?

"[OFFICER GUTIERREZ:]  *The fact that the defendant, when he murdered the other gang member* not only elevates his status and his clout within the gang but also the gang benefits because it's known that the Black Angels have to feed the reputation.  . . .

13

[T]hey feed that reputation by eliminating other members of their same gang to show that they're still ready and willing to kill for the same gang and anybody that cross[es] them." (Italics added.) The officer later testified that Black Angels had been known to kill other Black Angels because of "politics" in the gang culture, or essentially because the murdered gang member had broken the gang's rules.

At another point, the officer testified that Vega's murder would show other gang members that the Mexican Mafia could "reach out and touch anybody at any time whenever they please. . . . For them—*for the defendant to murder Manuel* [Vega] is just short of him murdering . . . ." At this point, the trial court sustained defense counsel's objection and admonished Officer Gutierrez to "[j]ust render an opinion as to the relationship with the gang. And you pose a hypothetical. *Because it's for the jury to decide who murdered the victim*." (Italics added.) When Officer Gutierrez later testified on rebuttal, the court again reminded the jurors that it was for them to decide whether defendant committed the murder.

2. <u>Analysis</u>

We review a court's denial of a motion for a new trial for an abuse of discretion. (*People v. Homick* (2012) 55 Cal.4th 816, 900-901.) A motion for a new trial may be made based on ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) To establish entitlement to relief based on ineffective assistance of counsel, a defendant must show (1) his counsel's representation was deficient, that is, it fell below an objective standard of reasonableness, and (2) it is reasonably probable the defendant

14

would have realized a more favorable result absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Doolin* (2009) 45 Cal.4th 390, 421.) There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (*Strickland v. Washington, supra,* at p. 689.) Accordingly, a reviewing court will reverse a conviction based on ineffective assistance of counsel "'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'" (*People v. Frye* (1998) 18 Cal.4th 894, 979-980, quoting *People v. Fosselman, supra,* 33 Cal.3d at p. 581.)

At issue here is whether defense counsel's performance was deficient because he failed to object each time Officer Gutierrez indicated or assumed in response to questions that defendant was the person who shot and killed Vega. To be sure, an expert should generally be asked and answer hypothetical questions that closely track the evidence but may not render an opinion that the defendant was the person who committed a crime because that is of no assistance to the trier of fact. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048-1049 & fn. 4 [noting in fn. 4 that, in some circumstances, expert testimony regarding the specific defendants might be proper].)

Here, Officer Gutierrez did not categorically testify that defendant was the person who shot and killed Vega. Rather, he made that assumption in responding to questions, rather than speak, as he should have, in terms of hypothetical facts based on the evidence. In denying the motion for a new trial, the trial court discerned that defense counsel had a tactical reason for failing to object each time the officer indicated or assumed that

15

defendant was the perpetrator: to later argue how biased the officer was against defendant. And as the People point out, defense counsel did object the second time the officer indicated that defendant was the perpetrator, and it was reasonable not to object every time the officer lapsed out of speaking hypothetically in order to avoid annoying the jury, and to later argue the officer was biased and had a preconceived notion that defendant was the perpetrator.

We agree with the People that counsel's performance was not deficient, both because counsel did object the second time the officer lapsed out of speaking hypothetically, and because his failure to repeatedly object—even after the trial court admonished the jury it was its job to determine whether defendant was the perpetrator—allowed him to argue the officer was biased. Furthermore, counsel's failure to repeatedly object could not have affected the result. As indicated, the trial court twice admonished the jurors that it was their job to determine whether defendant, and not someone else, shot and killed Vega. Given these admonitions, we discern no reasonable probability that the jury could have been confused or misled by the officer's periodic assumption that defendant shot and killed Vega.

B. *Substantial Evidence Supports the Jury's Finding That the Murder Was Gang Related*

Defendant next claims that insufficient evidence supports the gang enhancement on his murder conviction. (§ 186.22, subd. (b).) In reviewing a claim that insufficient evidence supports a criminal conviction or an enhancement, including a gang enhancement, we review the entire record in the light most favorable to the judgment to

16

determine whether it contains substantial evidence—that is, evidence of reasonable, credible, and solid value—such that a reasonable trier of fact could have found the conviction or enhancement true beyond a reasonable doubt. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60; *People v. Johnson* (1980) 26 Cal.3d 557, 575-578.)

The elements of the gang enhancement are set forth in section 186.22, subdivision (b)(1): "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," is subject to an enhanced sentence as provided in subdivision (b) of section 186.22.

Defendant argues the prosecution did not show the murder was committed for the benefit of, in association with, or at the direction of the South Side Onterio or the Mexican Mafia. Although he concedes there is substantial evidence that the South Side Onterio is a criminal street gang as defined in section 186.22, subdivision (f), he points out that Officer Gutierrez did not testify to the primary activities of, or to any predicate offenses committed by, Mexican Mafia members, but did testify that the "green light" on Vega "must have" been issued by a Mexican Mafia member given Vega's status as one of the highest-ranking Black Angels, the top tier of the South Side Onterio.

Defendant's claim fails because substantial evidence shows the murder was committed for the benefit of the South Side Onterio, if not the Mexican Mafia. Officer Gutierrez explained that South Side Onterio members will kill other members for breaking the rules or falling out of favor with the gang. The officer explained that the

17

murder benefited the South Side Onterio by: (1) promoting the gang's reputation as being ready and willing to kill anyone who crossed them, including their own high-ranking members, and (2) creating fear and intimidation in the community, thereby discouraging people from cooperating with law enforcement and enabling the gang to commit crimes. (*People v. Vang, supra,* 52 Cal.4th at p. 1048 ["'Expert opinion that particular criminal conduct benefited a gang' is not only permissible, but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement"].)

C. *Defendant's Active Gang Participation Conviction Must Be Reversed*

Defendant claims, and the People and we agree, that insufficient evidence supports defendant's active gang participation and the conviction must therefore be reversed. As the People concede, the crime of active gang participation requires the defendant to commit a felony with at least one other gang member. (*People v. Rodriquez, supra,* 55 Cal.4th at p. 1132 [substantive crime of active gang participation requires gang member to willfully advance felonious criminal conduct by another gang member].)

The elements of active gang participation include: (1) active participation in a criminal street gang that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523; § 186.22, subd. (a).)

The *Rodriguez* decision was issued in December 2012, after the trial in this case concluded in August 2012. The *Rodriguez* court clarified that the third element of active gang participation requires the involvement of more than one gang member; thus, the substantive crime of active gang participation cannot be committed by one gang member acting alone. (*People v. Rodriguez, supra*, 55 Cal.4th at pp. 1131-1139.) The court explained that section 186.22, subdivision (a), "reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members." (*People v. Rodriguez, supra,* at p. 1139.) And here, there was no evidence that any gang members other than defendant participated in the murder, even if defendant was in the company of gang members before and after the murder. To the contrary, the evidence showed only that defendant acted alone in committing the murder, shortly after he was seen on the surveillance videos leaving the Ontario Mills Mall with two other men.[4]

D. *The 10-year Stayed Term on the Gang Enhancement Must Be Stricken, and a 15-year Minimum Parole Eligibility Period Must Be Imposed on the 25-year-to-life Sentence for the Murder Conviction*

Lastly, defendant claims, and the People and this court agree, that the 10-year stayed term on the gang enhancement on count 1 must be stricken, and a 15-year minimum parole eligibility period must instead be imposed on the life sentence on count

---

[4] Defendant's further claim of instructional error on the active gang participation conviction—specifically, that CALCRIM No. 1400 erroneously suggested he could be convicted of the offense even if he acted alone—is therefore moot.

1.  Ordinarily, a 10-year term applies to a gang enhancement on a violent felony. (§ 186.22, subd. (b)(1)(C).)  But when, as here, the violent felony is punishable by life in prison, the 10-year term does not apply and the life term instead carries a 15-year minimum parole eligibility period.  (§ 186.22, subd. (b)(5); *People v. Lopez* (2005) 34 Cal.4th 1002, 1004 ["first degree murder is a violent felony that is punishable by imprisonment in the state prison for life and therefore is not subject to a 10-year enhancement under section 186.22[, subdivision] (b)(1)(C)."].)  Defendant's sentence is therefore amended accordingly.

## IV.  DISPOSITION

The judgment is amended as follows:  the 10-year stayed term on the gang enhancement on the murder conviction in count 1 is stricken, and a 15-year minimum parole eligibility period is instead imposed on the 25-year-to-life sentence on count 1. The matter is remanded to the trial court with directions to amend defendant's abstract of judgment to reflect this change to defendant's sentence, and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

21